IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

THE BAMA COMPANIES, INC.,

    **Plaintiff,**

v.

STAHLBUSH ISLAND FARMS, INC.,

    **Defendant.**

Case No. 18-CV-045-JFH-JFJ

## OPINION AND ORDER

This matter comes before the Court on a motion for summary judgment ("Motion") [Dkt. No. 73] filed by Defendant, Stahlbush Island Farms, Inc. ("Stahlbush"). Stahlbush seeks a ruling from the Court on the negligence, breach of contract and breach of warranty claims brought against it by Plaintiff, The Bama Companies, Inc. ("Bama"), regarding fruit grown by Stahlbush and sold to Bama for processing into pies. *Id.* Bama filed a response. Dkt. No. 76. Stahlbush filed a reply. Dkt. No. 79. For the reasons set forth herein, Stahlbush's Motion is granted in part and denied in part.

## STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir.

2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden to demonstrate the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).  If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671.  If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to him. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, a failure of proof "concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## UNDISPUTED MATERIAL FACTS

Stahlbush is a commercial farming operation with crops including individually quick frozen ("IQF") fruit. Dkt. No. 73 at ¶¶ 2-3; Dkt. No. 76 at ¶¶ 2-3.  Bama is a manufacturer of pies and other baked goods which purchased IQF fruit from Stahlbush at various times. Dkt. No. 73 at ¶ 1; Dkt. No. 76 at ¶ 1.  In 2016, Bama developed a new mixed berry pie exclusively for McDonald's. Dkt. No. 73 at ¶¶ 4-5; Dkt. No. 76 at ¶¶ 4-5.  Stahlbush and Bama verbally agreed on a sale of black raspberries for these pies in November 2016. Dkt. No. 73 at ¶¶ 7-9; Dkt. No. 76 at ¶¶ 7-9; Dkt. No. 73-4.[1]  The same day, Stahlbush's owner sent a contract to Bama with terms and conditions dated June 20, 2016. Dkt. No. 73-4.  These terms included warranty and limitation of liability sections, such as a disclaimer of implied warranties and a statement of each party's

---

[1] Bama and Stahlbush had also previously agreed on a sale of blueberries. Dkt. No. 73-5.

2

maximum cumulative liability. *Id.* at 2; Dkt. No. 73 at ¶¶ 10-12; Dkt. No. 76 at ¶¶ 10-12. Bama returned an executed copy of the contract with different warranty and limitation of liability sections. Dkt. No. 73-6; Dkt. No. 73 at ¶¶ 16-17; Dkt. No. 76 at ¶¶ 16-17.[2]

Under government regulations, food growers such as Stahlbush may sell highest grade IQF black raspberries even if the packages of fruit contain some harmless extraneous vegetable matter ("HEVM"), such as stems or leaves under a certain threshold. Dkt. No. 73 at ¶ 44; Dkt. No. 76 at ¶ 44. Raspberries also have a risk of foreign material being commingled with them during harvest, as the berries grow low to the ground. Dkt. No. 73 at ¶ 52; Dkt. No. 76 at ¶ 52. Compounding this risk of harvesting foreign material is a difficulty in removing any such material that is harvested: raspberries are relatively fragile and cannot be "float washed," a process where fruit is submerged in water so that heavier foreign objects sink away from the crop. Dkt. No. 73 at ¶ 53; Dkt. No. 76 at ¶ 53. Stahlbush operates under regulations from the United States Food and Drug Administration and a "Safe Quality Food" standard required by some large industry clients, both of which require control of foreign material during production through steps such as critical control points, sorting, optical review, floating, and washing. Dkt. No. 73 at ¶¶ 62-71; Dkt. No. 76 at ¶¶ 62-71. Stahlbush's operations scored 97% on food safety the year of the raspberry sale to Bama. Dkt. No. 73 at ¶ 65; Dkt. No. 76 at ¶ 65. Stahlbush and Bama's raspberry contract included a product specification page with a HEVM threshold of less than one per five pounds per production day and a statement regarding foreign material that the berries would be "free from metal, glass, wood, stones, etc." Dkt. No. 73 at ¶ 43; Dkt. No. 76 at ¶ 43; Dkt. No. 73-14; Dkt. No. 76-9.

---

[2] The pertinent differences in terms are quoted within the discussion of Bama's breach of warranty claim.

Government regulations also require food manufacturers such as Bama to perform risk assessments before manufacturing raw ingredients into finished products, which are meant to identify, evaluate, and establish procedures regarding ingredient hazards. Dkt. No. 73 at ¶ 54; Dkt. No. 76 at ¶ 54. These assessments include use of hazard analysis and critical control points ("HACCP"). Dkt. No. 73 at ¶ 55; Dkt. No. 76 at ¶ 55. Bama's "mainstay products" include McDonald's apple and cherry pies. Dkt. No. 73 at ¶ 50; Dkt. No. 76 at ¶ 50. Although Bama occasionally received pits in cherry shipments and core fragments in apple shipments, its HACCP plan stated physical hazards were a "low risk" hazard for fruit ingredients. Dkt. No. 73 at ¶¶ 57, 75; Dkt. No. 76 at ¶ 57, 75. Bama had not worked with black raspberries before and admits their processing is substantially different from that of apples and cherries, as raspberries have a higher risk of physical hazards than apples and cherries do for the reasons described above. Dkt. No. 73 at ¶¶ 6, 51-52; Dkt. 76 at ¶¶ 6, 51-52.

Bama began to manufacture pies using Stahlbush IQF black raspberries in March 2017, but production halted after Bama's metal detectors were tripped multiple times by the finished products. Dkt. No. 73 at ¶¶ 21-26; Dkt. No. 76 at ¶¶ 21-26. Though the parties dispute the details of the pies' contamination, they agree that 16 stones were discovered in manufactured pies during the investigation that ensued. Dkt. No. 73 at ¶¶ 27-31; Dkt. No. 76 at ¶¶ 27-31. None of the pies were introduced into the stream of commerce. Dkt. No. 73 at ¶ 32; Dkt. No. 76 at ¶ 32. Bama chose not to modify its manufacturing and screening processes, instead cancelling production of the berry pies because "metal detectors [are] not 100 percent" and because not all hazards are metal detectable. Dkt. No. 73 ¶¶ 34-35; Dkt. No. 76 at ¶¶ 34-35.

Stahlbush has presented an expert report from Dr. Siobhan Reilly, a food safety expert with more than 25 years of experience. Dkt. No. 73 at ¶¶ 36-40; Dkt. No. 76 at ¶¶ 36-40.[3] Bama has not presented an expert report and has not identified any specific ways Stahlbush's procedures were ineffective. Dkt. No. 73 at ¶¶ 72-73; Dkt. No. 76 at ¶¶ 72-73.

## AUTHORITY AND ANALYSIS

**Negligence Claim**

Bama correctly claims that "[a] person injured by the substandard performance of a duty derived from a contractual relationship may rely on a breach-of-contract or tort theory, or both, but even if the evidence supports both, the claimant can achieve but a single recovery." *Finnell v. Seismic*, 67 P.3d 339, 344 (Okla. 2003). However, Stahlbush does not challenge the existence of a duty. Dkt. No. 79 at 5. Instead, it challenges Bama regarding the standard of care. *Id.*

"The standard of care prescribes how a person must act or not act in order to satisfy the duty of care." *Morales v. City of Okla. City*, 230 P.3d 869, 878 (Okla. 2010). If a "standard of care, and whether its breach caused injury, is not within the common knowledge of [a] lay juror . . . [e]xpert testimony [is] necessary to establish what measures a reasonably careful person in [a defendant's] position would take, as well as whether this alleged failure caused [a plaintiff's] injury." *Cook v. McGraw Davisson Stewart, LLC*, 496 P.3d 1006, 1012 (Okla. Civ. App. 2021). *See also Johnson v. Hillcrest Health Ctr., Inc.*, 70 P.3d 811, 816 (Okla. 2003) ("The applicable standard of care and deviations therefrom causing an injury are ordinarily established by expert testimony, unless the common knowledge of lay persons would enable a jury to conclude the

---

[3] Bama raises some complaints about Dr. Reilley's methodology and process in its summary judgment response. *See* Dkt. No. 76 at ¶¶ 41-49. The proper way to challenge an expert is through a *Daubert* motion under Rule 702 of the Federal Rules of Evidence. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003). Bama has not done so.

5

applicable standard of care and whether its breach caused the injury."); *Harder v. F.C. Clinton, Inc.*, 948 P.2d 298, 305 (Okla. 1997) ("If the showing of any foundation fact requires a degree of knowledge or skill not possessed by the average person, expert testimony must be adduced.").

The general standard of care for performance of a contract under Oklahoma law is broadly defined: "Accompanying every contract is a common-law duty to perform it with care, skill, reasonable experience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract." *Keel v. Titan Const. Corp.*, 639 P.2d 1228, 1232 (Okla. 1981). The question then becomes how a fact finder would determine whether Stahlbush operated with "care, skill, reasonable experience, and faithfulness" in the realm of agricultural production.

Stahlbush claims that the standard of care for "food safety and manufacturing [is] beyond the ken of the average lay juror and require[s] expert testimony." Dkt. No. 73 at 24. Bama responds that "[i]t does not require an expert witness's opinion for anyone to understand that the presence of even a single stone in food is unreasonably dangerous . . . . Some concepts, like not having stones in your food, are so basic that they are grossly apparent to all of us." Dkt. No. 76 at 18. While the Court agrees with Bama that it is common sense that food should be stone-free by the time it reaches a ready-to-serve state, Bama oversimplifies the standard of care for Stahlbush's performance of the contract.

Bama does not dispute Stahlbush's description of its raspberry handling. Black raspberries have a heightened risk of physical hazards because they grow lower to the ground than, for instance, apples or cherries. Dkt. No. 73 at ¶ 52. Additionally, the berries are too delicate to go through a "float washing" process after harvest where heavier physical contaminants sink away from the crop of berries. *Id.* at ¶ 53. Bama also does not contest that Stahlbush operates under

6

United States Food and Drug Administration rules, complies with an additional food safety and quality management program called the Safe Quality Food standard, and has "critical control points" in its production line (as well as other points involving sorting, optical review, floating, and washing) to manage hazard control and foreign material. *Id.* at ¶¶ 62-71. None of these crop characteristics, operational regulations, or processing mechanisms are within the knowledge of an average person. The Court agrees with Stahlbush that the details of agricultural harvesting and processing are beyond a lay juror's experience. Expert testimony is needed to assist the jury in determining whether Stahlbush breached its standard of care.

Bama does not present expert testimony on how Stahlbush's protocols were lacking in care, skill, reasonable experience, or faithfulness.[4] A failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. Bama's negligence claim cannot withstand summary judgment.

**Breach of Contract and Breach of Warranty Claims**

Stahlbush also seeks summary judgment on Bama's breach of contract and breach of warranty claims. The Court must first consider what warranties became terms of the parties' contract before considering the interpretation of those terms.

**The Effect of the Battle of the Forms on Warranties**

The parties reached an agreement by verbal commitment on November 18, 2016. Dkt. No. 73 at ¶ 9; Dkt. No. 76 at ¶ 9; Dkt. No. 73-1 at 1; Dkt. No. 73-4 at 1. Stahlbush sent a written contract memorializing the agreement via email the same day. Dkt. No. 73-4. It included warranty and limitation of liability terms, including a disclaimer of implied warranties and a statement of

---

[4] Bama's response to Stahlbush's undisputed process instead somewhat resembles *res ipsa loquitur*. Because Bama does not develop this argument, the Court declines to consider it.

each party's maximum cumulative liability. *Id.* at 2. Bama returned an executed copy of the contract with a different set of terms attached. Dkt. No. 73-6. The differences in the terms included, in relevant part:

| **Stahlbush [Dkt. No. 73-4]** | **Bama [Dkt. No. 73-6]** |
|---|---|
| [T]he product will be in all respects in compliance with all applicable Federal laws, regulations, orders and directives . . . . [E]xcept for specific printed matter expressly required by Buyer to be placed on labeling or packaging, the product will not be adulterated, mislabeled or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act . . . . The product has not been processed to adequately reduce the presence of microorganisms of public health significance. The Buyer hereby gives written assurance to Seller that either: (a) the Buyer performs commercial processing described in 21 CFR 112.2(b)(1) and 21 CFR 117.135(a)(2) and has established and is following procedures (such as sufficient heat treatment, acidification, or cooking) that significantly minimize or prevent the presence of microorganisms of public health significance; or (b) the Buyer does not perform such commercial processing but the produce will receive such commercial processing by another entity in the distribution chain in a manner that adequately reduces the presence of microorganisms of public health significance . . . .[5] | The product(s) will be in all respects in compliance with all applicable Federal laws, regulations, orders and directives . . . . except for specific printed matter expressly required by Buyer to be placed on labeling or packaging, the product(s) will not be adulterated, mislabeled or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act or the Perishable Agricultural Commodities Act of 1930 . . . . Seller warrants that at the time of transfer of product the product(s) is fit for human consumption. |
| This warranty is expressly in lieu of all other warranties, express or implied. The implied warranties of merchantability and fitness for a particular purpose and all other warranties, | This warranty is expressly in lieu of all other warranties, express or implied. All other warranties, express or implied, are excluded from this transaction and shall not apply.[7] |

---

[5] The disclaimer regarding microorganisms was printed in bold, capitalized letters but is recreated here without such formatting for ease of reading.

[7] *See* n.6.

| | |
|---|---|
| express or implied, are excluded from this transaction and shall not apply.[6] | |
| [No indemnification provision] | To the extent covered by applicable insurance policies, Seller agrees to defend, indemnify and hold Buyer harmless from all claims for recall/retrofit of products and for damages, losses, injuries and/or death to persons or damage to property (hereafter "Indemnified Losses") to the extent resulting from a breach by Seller of any warranty or term of this Agreement. Indemnified losses will include, but not be limited to, reasonable attorney's fees, as well as any judgments paid or other expenses reasonably incurred. |
| Neither Seller nor its suppliers shall be liable, whether in contract or in tort or under any other legal theory, for loss of use, revenue or profit, or for cost of capital or of substitute use or performance, or for incidental, indirect, special or consequential damages, or for any other loss or cost of similar type, or for claims by Buyer for damages of Buyer's customers.[8] | Except for first or third party damages under [the indemnification provision] that are covered by insurance, neither Seller nor its suppliers shall be liable, whether in contract or in tort or under any other legal theory, for loss of use, revenue or profit, or for costs of capital or of substitute use or performance, or for incidental, indirect, special, or consequential damages, or for any other loss or cost of similar type, or for claims by Buyer for damages of Buyer's customers.[9] |

Stahlbush claims that Bama's terms are a material alteration under § 2-207 of the Uniform Commercial Code, a section often known as the "battle of the forms." It argues that Bama's terms "represent a major shift in Stahlbush's potential liability and its warranties . . . [including] that all 130,710 pounds of berries had to be completely pure and ready for immediate human consumption, contrary to the reality that Bama would be further processing the ingredient." Dkt. No. 72 at 24.

---

[6] This disclaimer was also printed in bold, capitalized letters.

[8] *See* n.6.

[9] *See* n.6.

9

Bama claims Stahlbush's terms were only a draft and different terms between the two documents negated each other, leaving UCC "gap filler" provisions to govern. Dkt. No. 76 at 22.[10]

Section 2-207, codified in Oklahoma law at 12A O.S. § 2-207 and titled "Additional Terms in Acceptance or Confirmation," is "a murky bit of prose" within the UCC. *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984). The statute "is silent on the treatment of terms stated in the acceptance that are *different*, rather than merely additional, from those stated in the offer." *Daitom*, 741 F.2d at 1578 (emphasis in original). Three approaches exist to resolve the issue. First, some courts "treat 'different' terms as included under the aegis of 'additional' terms," with the result that "different terms in the acceptance would never become part of the contract, because, by definition, they [] materially alter the contract." *Id.* at 1579. Second, in some cases, "the offeror's terms control because the offeree's different terms merely fall out; § 2-207(2) cannot rescue the different terms since that subsection applies only to *additional* terms." *Id.* (emphasis in original). "The third[] and preferable approach, which is commonly called the 'knock-out' rule, is that the conflicting terms cancel one another." *Id.*

> Under this view the offeree's form is treated only as an acceptance of the terms in the offeror's form which did not conflict. The ultimate contract, then, includes those non-conflicting terms and any other terms supplied by the U.C.C., including . . . "gap fillers" or "off-the-rack" terms (e.g., implied warranty of fitness for particular purpose, § 2-315) . . . .
>
> We are of the opinion that this is the more reasonable approach, particularly when dealing with a case such as this where from the beginning the offeror's specified period of limitations would expire

---

[10] Bama cites § 2-207(3) for this proposition. Subsection 3 addresses the terms of a contract when "[c]onduct by both parties [] recognizes the existence of a contract . . . although the writings of the parties do not otherwise establish a contract." 12A O.S. § 2-207(3). This subsection does not apply, as the parties agree that the forms were exchanged following a verbal agreement between the parties. Dkt. No. 73 at ¶ 9; Dkt. No. 76 at ¶ 9. Instead, subsection 1 applies because the documents were "written confirmation[s] which [were] sent within a reasonable time" after the verbal agreement. 12A O.S. § 2-207(1).

> before the equipment was even installed. The approaches other than the "knock-out" approach would be inequitable and unjust because they invited the very kind of treatment which the defendant attempted to provide.

*Id.* In the absence of controlling Oklahoma authority, this Court follows the Tenth Circuit and applies the knock-out rule. *See Victory Energy Ops., LLC v. Legacy Mech., LLC*, No. 20-CV-157-GKF-JFJ, 2020 WL 7014595, at *7 (N.D. Okla. June 15, 2020).

It is clearly apparent to the Court that Bama's terms are different from, rather than additional to, Stahlbush's terms. Stahlbush states in bold capitalized letters that the product has not been processed adequately for human consumption at the time of its sale. Dkt. No. 72-4 at 2. Although the warranty specifically discusses the presence of microorganisms of public health significance, which the parties do not raise as an issue in the case, the general import of the section is the same: fruit sold under Stahlbush's terms is not ready to be eaten in its current state. Conversely, Bama's terms state the seller warrants "at the time of transfer of product the product(s) is fit for human consumption." Dkt. No. 72-6 at 1. Because these terms differ from each other, the knock-out rule applies and neither warranty became a term of the parties' contract. Instead, the Court must consider the impact of UCC gap filler terms, such as express warranties, implied warranties of merchantability, and implied warranties of fitness for a particular purpose. 12A O.S. §§ 2-313, 2-314, 2-315; *Daitom*, 741 F.2d at 1580.

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 12A O.S. § 2-313. Although implied warranties may be disclaimed, as will be explained, "it is usually held that . . . express warranties cannot be." 12A O.S. § 2-313 Oklahoma code comment. Because the parties have not identified any express warranty of the raspberries' suitability for immediate human consumption other than the "knocked

11

out" term within Dkt. No. 73-6, no express warranty on this topic exists.[11]  However, an express warranty arose that the raspberries would be free of stones, as Stahlbush's product specification guide clearly states "Product shall be free from metal, glass, wood, stones, etc."  Dkt. No. 76-9.

The next question is implied warranties of merchantability and fitness for a particular purpose.  Under Oklahoma law, following the UCC and its comments, "[d]isclaimer of the implied warranty of merchantability is permitted . . . with the safeguard that such disclaimers must mention merchantability and in case of a writing must be conspicuous.  Unlike the implied warranty of merchantability, implied warranties of fitness for a particular purpose may be excluded by general language, but only if it [sic] is in writing and conspicuous."  *Perry v. Lawson Ford Tractor Co.*, 613 P.2d 458, 465 n.20 (Okla. 1980).  Stahlbush's warranty disclaimer specifically mentions implied warranties of merchantability and fitness for a particular purpose as well as all other warranties, express or implied.  Dkt. No. 73-4.  Bama's warranty disclaimer does not specify the merchantability and fitness warranties.  Dkt. No. 73-6.  Both are conspicuous through their use of bold, capitalized language.  Since Bama's disclaimer does not mention merchantability with the requisite specificity, it is a different term from Stahlbush's terms, and under operation of the knock-out rule, Stahlbush's disclaimer is ineffective.  However, the implied warranty of fitness for a particular purpose may be disclaimed through a general statement.  Because both sets of terms include a general statement, this warranty was properly disclaimed.

---

[11]  Based on its analysis of the raspberries' unsuitability for human consumption at the time of sale, the Court agrees with Stahlbush that Bama's citation to 21 U.S.C. § 331 and FDA Compliance Policy Guide CPG § 555.425 is not applicable.  Section 555.425 requires both that a "hard or sharp foreign object" is present in food and that the "product is ready-to-eat . . . [or] requires only minimal preparation steps, e.g., heating, that would not eliminate, invalidate, or neutralize the hazard prior to consumption."  Stahlbush did not hold out the raspberries as ready-to-eat, nor did Bama intend to serve them with only minimal preparation.

Merchantability requires goods to be fit for their ordinary purposes. 12A O.S. § 2-314. It is "a flexible concept which does not connote best quality or perfection in detail." *Hot Energy Servs. v. Quikwater, Inc.*, No. 15-CV-236-GKF-FHM, 2017 1284785, at *1 (N.D. Okla. Feb. 24, 2017) (citing *Perry*, 613 P.2d at 463; 12A O.S. § 2–314(2)(c); *Schrock v. Wyeth, Inc.,* 727 F.3d 1273, 1288 (10th Cir. 2013)). Oklahoma courts apply a "reasonable expectation" test to determine merchantability of foodstuffs—for instance, "[i]f it is found that the pit of a cherry should be anticipated in cherry pecan ice cream and guarded against by the consumer, then the ice cream was reasonably fit under the implied warranty." *Williams v. Braums Ice Cream Stores*, 534 P.2d 700, 702 (Okla. Civ. App. 1974)). *See also O'Dell v. DeJean's Packing Co., Inc.*, 585 P.2d 399, 401-403 (Okla. Civ. App. 1978) (discussing the reasonable expectation test in the context of an ultimate consumer plaintiff). "What should be reasonably expected by the [purchaser] is a jury question." *Williams*, 534 P.2d at 702. Summary judgment is thus inappropriate.

Neither Stahlbush's wide warranty disclaimer nor Bama's targeted warranty of suitability became terms of the parties' contract. Insofar as Bama's warranty claim involves the berries' suitability for immediate human consumption, summary judgment is granted. Insofar as Bama's warranty claim involves (1) an express warranty that the berries would be free of stones and/or (2) an implied warranty of merchantability, summary judgment is denied.[12]

---

[12] The parties do not thoroughly brief their dispute regarding Bama's indemnification clause, focusing instead on the fitness for human consumption clause. The Court views this clause as an additional term that makes a material alteration to the parties' contract regarding their respective liability. Consequently, the indemnification clause did not become part of the contract. 12A O.S. § 2-207(2).

**Interpretation of "Free From . . . Stones"**

Attached to the parties' contract is a one-page "Product Specification" prepared by Stahlbush and created for Bama. Dkt. No. 73-14; Dkt. No. 76-9. Relevant to the parties' dispute is the "physical qualities standards" section of the document:

- Size-  IQU whole.
- Color-  Typical of ripe, black raspberry.
- Sensory-  Typical of fresh, ripe, black raspberry. No off flavors or odors.
- Chemical-  No additives.
- Product shall be free from metal, glass, wood, stones, etc.
- HEVM:  < 1 per 5 LBS per production day.
- Product will pass through two properly functioning optical sorters and will be verified prior to shipping.

*Id.* Bama relies on this plain language, noting that no adjective modifies the "free from" description and that "when a tolerance was acceptable, [Stahlbush] specifically delineated [it] in the warranty." Dkt. No. 76 at 18-19 (citing the "HEVM: < 1 per 5LB per production day" specification). It contends that Stahlbush's "free from" language "should be construed in its normal common-sense manner – which means lacking even an infinitesimal amount of contamination." *Id.* at 20.

Contrastingly, Stahlbush argues that an interpretation of "free from . . . stones" which requires that "all 130,710 pounds of berries could not contain a single stone is absurd on its face." Dkt. No. 73 at 20. In its view, because Bama had a food safety plan in place to detect HEVM, "Bama cannot contend it expected and contracted for a 100% pure ingredient while simultaneously establishing procedures to identify and eliminate impurities." *Id.*

Stahlbush claims that if the Court applies the rule that the whole of a contract should be construed together, the tolerance for HEVM "indicates that, even absent consideration of industry and expert evidence, 'free from' cannot mean absolute perfection and purity of the entire shipment of berries." Dkt. No. 79. But Bama did not request absolute perfection and purity. Instead, Stahlbush chose to include stones in its list of materials that would have no presence whatsoever in the shipment, not in its list of materials that would be present in trace amounts in the shipment. It does not create an absurdity to hold Stahlbush to its word.[13] Stahlbush's motion for summary judgment is denied.

## CONCLUSION

IT IS THEREFORE ORDERED that the motion for summary judgment [Dkt. No. 73] filed by Defendant, Stahlbush Island Farms, Inc., is GRANTED IN PART and DENIED IN PART. It is GRANTED as to (1) Bama's negligence claim and (2) Bama's breach of warranty claim insofar as it is based on a warranty that Stahlbush's IQF black raspberries would be fit for human consumption at the time of sale from Stahlbush to Bama. It is DENIED as to Bama's breach of contract claim and breach of warranty claim insofar as it is based on (1) an express warranty that the raspberries would be free of stones or (2) an implied warranty of merchantability.

Dated this 20th day of June 2024.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE

---

[13] Because the Court does not believe the contract to be ambiguous, it does not apply 15 O.S. § 170, which states that ambiguous "language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." That said, were the contract somehow construed as ambiguous, this rule of contract interpretation would yield the same result.